J-S46016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.O. A/K/A A.A.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.O., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 708 EDA 2019 |

Appeal from the Decree Entered February 6, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000111-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.O. A/K/A A.A.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.O., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 709 EDA 2019 |

Appeal from the Order Entered February 6, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002929-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: E.O. A/K/A E.J.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.O., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 710 EDA 2019 |

Appeal from the Decree Entered February 6, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000114-2017

J-S46016-19

| IN THE INTEREST OF: E.O. A/K/A | : | IN THE SUPERIOR COURT OF |
| E.J.O., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.O., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 711 EDA 2019 |

Appeal from the Order Entered February 6, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002931-2014

| IN THE INTEREST OF: S.O. A/K/A | : | IN THE SUPERIOR COURT OF |
| S.M.O., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.O. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 712 EDA 2019 |

Appeal from the Decree Entered February 6, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000112-2017

| IN THE INTEREST OF: S.O. A/K/A | : | IN THE SUPERIOR COURT OF |
| S.M.O., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.O. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 713 EDA 2019 |

Appeal from the Order Entered February 6, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002928-2014

- 2 -

| IN THE INTEREST OF: L.O. A/K/A L.M.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.O., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 714 EDA 2019 |

Appeal from the Decree Entered February 6, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s): CP-51-AP-0000113-2017

| IN THE INTEREST OF: L.O. A/K/A L.M.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.O. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 715 EDA 2019 |

Appeal from the Order Entered February 6, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at No(s): CP-51-DP-0002927-2014

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED NOVEMBER 25, 2019**

A.O. ("Mother") appeals from the decrees and orders entered on February 6, 2019, granting the petitions filed by the Philadelphia Department of Human Services ("DHS" or the "Agency") to terminate her parental rights to her minor children, A.O. a/k/a A.A.O., (a male born in December 2004); S.O. a/k/a S.M.O. (a female born in June 2009); L.O. a/k/a L.M.O., (a female

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 3 -

born in February 2007); and E.O. a/k/a E.J.O. (a male born in May 2011) (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and to change the permanency goals for the Children to adoption under the Juvenile Act, 42 Pa.C.S.A. § 6351.[1, 2, 3] We affirm.

In its opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the trial court set forth the factual background and procedural history of this appeal, which we adopt herein. *See* Trial Court Opinion, 4/25/19, at 4-29. As this matter is before us after a remand based on *In re Adoption of*

_____

[1] The February 6, 2019 termination decrees as to Mother with regard to each of the Children is missing from the certified record, but the trial court stated its decrees on the record at the hearing on February 6, 2019.

[2] We note that on November 30, 2017, the trial court also terminated the parental rights of M.O., the Children's father ("Father"). Trial Court Opinion, 4/25/19, at 1-2. Father has not filed an appeal from this decree. *Id.*

[3] The trial court explained:

> Mother's parental rights were not terminated as to another child, M.O., a male, born [in July 2001]. This child is 17 years old and is in placement in a Group Home through St. Francis. Mother's other child, M.O., a female, born [in September 1999], was discharged from court supervision because the child attained 18 years of age. An order for termination of court supervision was entered by th[e trial] court on 9/27/2017.

Trial Court Opinion, 4/25/19, at 2 (citations and some capitalization omitted).

*L.B.M.*, 161 A.3d 172, 179-180 (Pa. 2017),[4] we set forth only the facts and procedural background from this Court's Memorandum filed on July 20, 2018, as follows.

> In December 2014, the Philadelphia Department of Human Services (DHS) first became aware of Mother and her family when it received a report that one of Mother's other children, M.O., attended school with cuts and abrasions on his right ankle and knuckles. Mother allegedly threw crutches at M.O. in an effort to keep him from going to school, causing the open wounds to his ankle and knuckles. The report further alleged that the home was filthy and housed ten dogs, including a dead dog with puppies. Parents were unemployed, the family had a history of involvement with DHS, and three other siblings of school age were being kept home by parents. DHS visited the home and found it was without heat, had holes in the walls and doors, and trash was strewn throughout the dwelling. Numerous dogs and cats were living there in unsanitary conditions and seven children were sleeping in the same small bedroom. DHS entered a protective custody order for Children and they were placed in foster care.
>
> On April 20, 2015, Children were adjudicated dependent, legal custody to remain with DHS. The following parental objectives were set for Mother:
>
> (1) address and stabilize mental health by continuing treatment; (2) sign release forms for the Community Umbrella Agency (CUA) to obtain mental health background information; (3) attend appointments for Children and sign releases and consents for their treatment; (4) contact Intellectual Disability Services (IDS) to schedule intake appointment; (5) participate in Parent-Child Information Therapy (PCIT); (6) and comply with monthly, supervised visits with Children at the [A]gency. In September 2015, Mother was diagnosed with Post Traumatic Stress Disorder

---

[4] In *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) our Supreme Court held that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome.

(PTSD), bipolar disorder, major depressive disorder, and a learning disability. Mother also has a history of drug abuse.

Mother's weekly, supervised visitation with Children was increased from one to four hours in January 2016. In March 2016, the court reduced Mother's supervised visitation at the [A]gency to every other week for two hours. In August 2016, Mother was discharged from a drug and alcohol program due to her failure to report for services. Mother tested positive for opiates in October 2016. At an October 25, 2016 permanency review hearing, the court determined that Mother had been minimally compliant with her parental objectives, having not completed parenting classes or obtained suitable housing. Mother tested positive for opiates again in December 2016.

On January 30, 2017, DHS filed petitions to involuntarily terminate Mother's parental rights to Children pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. On April 11, 2017, the trial court appointed a Child Advocate Attorney (CAA), Regina Charles-Asar, Esquire, for all four Children. A goal change/termination hearing was held on November 30, 2017. At the hearing, [Community Umbrella Agency ("CUA")] case manager [Mariam Colon, from Northeast Treatment Centers, ("NET");] parenting capacity evaluator, [William Russell, Ph.D., a forensic psychologist at Forensic Mental Health Services;] [] CUA case manager, [Frank Cervantes;] CUA supervisor, [Kesa Lewis]; Educational Decision Maker, [Ann Umbrecht; critical care manager, Laura Hershel, from Community Behavioral Health, ("CBH")]; and[,] Mother testified. [Attorney Charles-Asar was present, and represented the legal interests of the Children. Attorney Adrianna Alfano was present and represented the Children as their guardian *ad litem* ("GAL").] The court ultimately terminated Mother's parental rights to Children under sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. Mother filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. She present[ed] one issue for our consideration: Whether the trial court erred in refusing to determine if legal counsel for the Children had met with the children, had determined their legal interests, and whether counsel understood her duties as legal counsel?

*In Interest of A.A.O.*, 194 A.3d 693 (Pa. Super. 2018) (unpublished memorandum) at **2-5 (footnote omitted).

In the Memorandum decision filed on July 20, 2018, this Court vacated the decrees terminating Mother's parental rights to the Children entered on November 30, 2017, because the panel was unable to discern whether the CAA, Attorney Charles-Asar, adequately considered each child's legal interest in addition to each child's best interest. *Id.* at 5-9. The panel noted that Attorney Charles-Asar's questions of the witnesses were not of the type that would shed light on each child's preferred outcome and that Attorney Charles-Asar did not file a brief on appeal, which made the Court's inquiry into her legal representation of the Children more difficult. *Id.* Accordingly, the panel vacated the termination decrees, without prejudice, and remanded the matter for an on-record inquiry as to whether Attorney Charles-Asar adequately consulted with each child and determined his or her legal interests in the matter. The panel instructed:

> If the court concludes that counsel did not carry out her legal duties, as espoused in *L.B.M.*, then the court shall order a new termination hearing to provide counsel an opportunity to advocate on each Child's behalf. If, however, the court is convinced that counsel fulfilled her duty to each Child, then it may reaffirm its original termination order.

*Id.* at 10.

Upon remand, the trial court held a hearing on December 12, 2018, at which Mother's counsel questioned Attorney Charles-Asar regarding her ascertainment of the Children's preferred outcomes prior to the hearing on

November 30, 2017. N.T., 12/12/18, at 3. Attorney Charles-Asar indicated that she met with A.O. prior to the November 30, 2017 hearing, but she did not meet with the three younger children. *Id.* at 3-4. The trial court then ruled that, to comply with the directive of this Court on remand, Attorney Charles-Asar was required to meet with all four Children, and the trial court would "give this [matter] another listing." *Id.* at 4. Notably, Mother's counsel did not object to this procedure. DHS's counsel requested the court to re-enter its termination decree as to A.O. only, since Attorney Charles-Asar had interviewed A.O. regarding his preferred outcome prior to the November 30, 2017 hearing. *Id.* at 5. The trial court denied the request. *Id.* At the conclusion of the hearing, Mother's counsel asked the trial court to consider allowing Mother supervised visitation with the Children, since the prior termination decrees were vacated. *Id.* at 7.

The following exchange occurred:

**THE COURT:** No, the record was overwhelming at the [termination of parental rights ("TPR")] hearing and[,] absent the technical issue, I have no doubt in my mind about the prior decision[;] however, the area of law has evolved ever since [*L.B.M.* W]e will complete the record as required by the Appellate Court, and we'll proceed from there, but I do not find it in the best interest of the [C]hildren to re-initiate a relationship that may not continue to exist. . . .

* * *

**THE COURT:** I'll be guided by counsel [-] how much time do you need?

**[UNKNOWN SPEAKER]:** A 30[-]day date is fine.

**COURT CLERK:** February 6[, 2019].

**[MOTHER'S COUNSEL]:** Are you looking at those as a contested or status hearing?

**THE COURT:** It's a status hearing because[,] if the [c]ourt is authorized to re-enter its prior order without further hearing, I may also have to reopen on certain issues.

**[MOTHER'S COUNSEL]:** Thank you, your Honor.

**COURT CLERK:** February 6, 10:30, back here.

N.T., 12/12/18, at 7-8.

Thereafter, on February 6, 2019, the trial court convened a status hearing, and, again, Mother's counsel did not object to the nature of the proceeding. Although called a status conference, some evidence was obtained at the February 6, 2019 hearing. Upon questioning by counsel for DHS, Attorney Charles-Asar testified to her discussions with the Children, and the preferred outcome of each of the Children. Attorney Charles-Asar testified that she originally ascertained the Children's positions prior to the November 30, 2017 hearing by speaking with the GAL for the Children, and by having a lengthy conversation with the Court-Appointed Special Advocate ("CASA"). N.T., 2/6/19, at 4-5. The CASA discussed with the Children the idea of moving forward with terminating Mother's parental rights. *Id.* at 5. Attorney Charles-Asar further testified that she met with A.O., L.O., and S.O. on December 17, 2018, and met with E.O. on December 20, 2018. *Id*. at 4. Attorney Charles-Asar testified that each of the Children stated that he or she was happy in his or her foster home, and that they wished to remain there and to be adopted.

- 9 -

*Id.* Attorney Charles-Asar testified that, from her individual discussions with each of the Children in December 2018, she could confirm that her understanding of the Children's preferred outcomes at the time of the hearing on November 30, 2017, which she advocated, was the same position that they expressed to her in December 2018, *i.e.*, the Children were happy and wished to be adopted and remain in their pre-adoptive foster homes. *Id.* at 5.

On cross-examination by Mother's counsel, Attorney Charles-Asar testified that on November 30, 2017, prior to the hearing, A.O. had expressed to her that he loved Mother, and that "he understands if he can't be with his mom, he is happy where he is, and that is where he wants to stay." *Id.* at 6. When Mother's counsel attempted to question Attorney Charles-Asar concerning whether A.O. changed his preferred outcome at the time of his December 2018 interview, the trial court sustained DHS' counsel's objection. *Id.* at 6-8. Mother's counsel then called Mother on direct examination to testify as to whether she saw any of the Children since November 2017, in an attempt to establish whether Mother had contradictory evidence as to A.O.'s preferred outcome; specifically, whether A.O. stated to Mother that he does not wish to be adopted. *Id.* at 9. The trial court sustained DHS's objection to Mother's proffered testimony based on the lack of relevancy. *Id.* at 9. Mother's counsel requested that the trial court allow the Children at least one visit with Mother before the court determined their legal interests, as the passage of time between the November 30, 2017 and the February 6, 2019

hearings made it more likely that the Children would feel that Mother was out of their lives. *Id.* at 10-11. The trial court denied the request. *Id.* at 11.

During the February 6, 2019 hearing, the trial court stated that it specifically recollected the termination hearing held on November 30, 2017, and that it was the court's finding at that time that Mother had "no credibility whatsoever." *Id.* at 12. The trial court found that Mother's testimony was "coached . . . rehearsed . . . and made to make [M]other appear in the most favorable light." *Id.* The trial court further found that Mother's testimony had no bearing on the truth of Mother's relationship with the Children and how she was in a position to care for them. *Id.* The trial court also concluded that the hearing on February 6, 2019 completed the process for which this Court had remanded the matter, which was for Attorney Charles-Asar to present information concerning the preferred outcomes of all of the Children. *Id.* The trial court stated:

> [T]he evidence is further clear and convincing that it would be in the best interest of the [C]hildren to be adopted, that the termination of [M]other's parental rights would present no irreparable harm to the [C]hildren[,] and that it would be in their best interest to be adopted. I would reinstate my findings.

*Id.* at 13.

Mother's counsel requested a new hearing on the basis that the language in this Court's remand order required a new hearing, because Attorney Charles-Asar did not independently ascertain the Children's preferred outcomes before the November 30, 2017 hearing, and "now that she has[,] it

- 11 -

requires a new hearing so that she can advocate for their interest." *Id.* at 13.
The trial court denied the request based on its interpretation of the remand
order as directing the court to complete the necessary review regarding the
preferences of the Children. *Id.* at 14. The trial court stated that the
November 30, 2017 hearing was adequate and explored all of the evidentiary
issues, and that the hearing provided the court with all of the information
needed to make credibility and weight determinations based on the evidence.
*Id.* at 13-14. The trial court "re-affirmed" the original termination decrees
and changed the permanency goal for the Children to adoption. *Id.* at 15.
The trial court stated, "So the rights are terminated, let me add the phrase,
*nunc pro tunc*, back to the original termination, . . . and the goal is changed
to adoption." *Id.*

Thus, on February 6, 2019, the trial court reinstated the decrees of
involuntary termination of parental rights and orders that changed the
permanency goal for the Children to adoption. On March 7, 2019, Mother
timely filed notices of appeal, along with concise statements of errors
complained of on appeal. This Court consolidated the appeals on April 5, 2019.

On appeal, Mother raises the following issues:

1. Did the Juvenile Court err or abuse its discretion by reinstating
the TPR at a status listing, thereby denying [M]other the
opportunity to subpoena her children to testify at an evidentiary
hearing as to their legal interests?

2. Did the Juvenile Court err or abuse its discretion by reinstating
the TPR when the [C]hildren's preferred outcome was not clear,
given that the child advocate's report indicated a change from

- 12 -

when she had originally interviewed one or more of the [C]hildren; and her report indicated that he/she was not clear about whether or not he/she wished to be adopted?

3. Did the Juvenile Court err or abuse its discretion by denying a trial *de novo* on the remand thereby denying the [C]hildren effective assistance of counsel in an evidentiary hearing upon the remand in which their counsel could fully participate[?]

4. Did the Juvenile Court further err or abuse its discretion by re-instating the TPR *nunc pro tunc*?

5. Did the Juvenile Court err or abuse its discretion in determining that Petitioner, Department of Human Services (DHS), had met its burden of proof by clear and convincing evidence under the Adoptions Act, 23 Pa.C.S. §2511 (a)(1), (2), (5), and/or (8)?

6. Did the Juvenile Court err or abuse its discretion in determining that Petitioner, DHS, had met its burden of proof that changing the child's permanency goal to adoption and terminating Mother's rights would best serve the needs and welfare of the child under 42 Pa.C.S.A.§ 6351(e) and (f); and 23 Pa.C.S. [§] 2511(b)[?]

Mother's Brief at 4. [5]

Mother requests this Court to vacate and remand the involuntary termination decrees and goal change orders for an evidentiary hearing to determine whether the Children's legal interests were properly ascertained and represented in the trial court, and, if necessary, appoint new counsel for

_____

[5] Although Mother stated her issues somewhat differently in her concise statement, we find that she preserved the issues for our review. ***See Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal).

- 13 -

the Children and hold a new termination of parental rights/goal change hearing. Mother's Brief at 32.

In the argument portion of her brief, Mother combines her first four issues into one overarching issue: whether the trial court did not allow a thorough inquiry about, and representation of, the Children's legal interests? Mother's Brief, at 17. With regard to her sixth issue, Mother argues that the manner in which Attorney Charles-Asar ascertained the Children's true desires and legal interests fatally flawed the court's inquiry as to whether termination of parental rights would best serve the needs and welfare of the Children under 23 Pa.C.S. § 2511(b), and whether a change of the permanency goals to adoption under 42 Pa.C.S. § 6351(e) and (f) was warranted. *Id.* at 16. We will, therefore, address Mother's issues 1-4 and 6 together, as they are interrelated.

Mother argues that the trial court reinstated the involuntary termination decrees at a status hearing, thereby denying Mother the due process opportunity to subpoena her children to testify at an evidentiary hearing regarding their legal interests. *Id.* at 15. Mother contends that the Children's preferred outcome was not clear from Attorney Charles-Asar's report, and that Attorney Charles-Asar's report indicated a change from when she originally interviewed A.O. *Id.* at 12-15. Mother asserts that A.O. was not clear about whether he wished to be adopted. *Id.* Mother further argues that the trial court, by denying her request for a trial *de novo*, or, at the very least, an

evidentiary hearing, denied the Children an opportunity for effective assistance of counsel in an evidentiary hearing in which their counsel could fully participate. *Id.* at 15. Mother argues that, by reinstating the TPR *nunc pro tunc*, the trial court validated the "structurally flawed November 2017 process" that occurred when A.O. indicated a preference for reunification and had no advocate for such an outcome. *Id.* For the foregoing reasons, based on *In re L.B.M.* and its progeny, Mother requests that this Court vacate the decrees and orders, and remand the matter for an inquiry into the Children's legal interests and their position on the change of their permanency goals. *Id.* at 25. With regard to her sixth issue, Mother contends that, given that A.O. informed Attorney Charles-Asar that, if he could not return to Mother he would like to be adopted by his foster parent, the trial court erred in failing to inquire whether Attorney Charles-Asar explored any legal options for permanency under section 6351 of the Juvenile Act other than goal change to adoption. *Id.* at 30-31.

We find that Mother waived the first four issues and her sixth issue by failing, at the hearing held on December 12, 2018, to request a trial *de novo* so that she could subpoena witnesses, including the Children. At the December 12, 2018 hearing, the trial court determined that, prior to the November 30, 2017 termination hearing, Attorney Charles-Asar personally interviewed only A.O., and relied on the statements of the GAL and the CASA for the other three Children with regard to their preferred outcomes. Thus,

the trial court directed Attorney Charles-Asar to meet with all four Children prior to a status hearing scheduled for February 6, 2019. Mother's counsel did not object to the status hearing procedure and appeared at the February 6, 2019 hearing. She did not argue that this Court's remand order required a *de novo* trial until after she learned of the trial court's ruling on the termination and permanency goal change petitions at the February 6, 2019 hearing. **See** N.T., 2/6/19, at 13. In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of trial. **Tindall v. Friedman**, 970 A.2d 1159, 1174 (Pa. Super. 2009). The purpose of the rule is that the trial court be afforded an opportunity to correct any error at the time it is made. **Jackson v. Kassab**, 812 A.2d 1233, 1235 (Pa. Super. 2002). Mother's counsel did not timely make a request for a new evidentiary hearing, as she should have objected and requested a *de novo* evidentiary hearing at the December 12, 2018 hearing if she believed that our remand order required such a hearing.

To the extent that Mother argues that she was denied the opportunity to subpoena the Children to elucidate whether Attorney Charles-Asar adequately represented their wishes, Mother did not raise the issue of subpoenaing the Children in the trial court prior to or at the February 6, 2019 hearing, nor did she seek to have them testify before the trial court. To the contrary, at both the December 12, 2018 hearing and the February 6, 2019 hearing, Mother's counsel only requested an opportunity to have the Children

meet with Mother, because of the length of time that had passed during the course of the litigation, in order for the Children to determine whether their legal interests "truly are to be adopted at this time." N.T. 2/6/19, at 10-11; *see also* N.T., 12/12/18, at 7-8. Pa.R.A.P. 302(a) provides: "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Thus, we find that Mother waived any issue concerning the trial court's failure to afford her an opportunity to subpoena the Children by failing to raise such an issue until her brief on appeal.

Moreover, if Mother had not waived her first four issues and her sixth issue, we would find that they lack merit. In our July 20, 2018 order, this Court ordered the matter remanded for an "on-the-record determination as to whether counsel adequately consulted with each Child and determined his or her legal interests in the matter", as required by **L.B.M.** We stated that, if the trial court were "convinced that counsel fulfilled her duty to each Child, then it may reaffirm its original termination order." **Interest of A.A.O.**, 194 A.3d 693 (Pa. Super. 2018) (unpublished memorandum) at *10. Only in the event that the trial court were to conclude that counsel did not carry out her legal duties as set forth in **L.B.M.** was the trial court to order a new termination hearing to provide counsel an opportunity to advocate on each Child's behalf. **Id.**

At the February 6, 2019 hearing, the trial court was satisfied that Attorney Charles-Asar's understanding of the Children's preferred outcomes

at the time of the November 30, 2017 hearing, through speaking with A.O. and the Children's GAL and CASA, was consistent with the Children's preferred outcomes, as expressed directly to her in December 2018. The trial court was satisfied that, at the November 30, 2017 hearing, Attorney Charles-Asar was not hampered in her ability to advocate for the preferred outcomes of the Children because she had spoken directly to only one of them concerning the matter of preferred outcome, and that she advocated for the Children's preferred outcomes.

Essentially, Mother is arguing that the trial court should have not only directed Attorney Charles-Asar to interview the Children, but to represent them at a new evidentiary hearing, and advocate that Mother's parental rights should not be terminated. Mother relies on *In re Adoption of T.M.L.M.*, 184 A.3d 585 (Pa. Super. 2018), for the proposition that, where there is no basis to conclude that the child's counsel properly represented the child's legal interests, this Court will decide that the child was deprived of his or her statutory right to counsel. Mother's Brief at 25. Recently, our Court specifically overruled the decision in *T.M.L.M.* in *In re Adoption of K.M.G.*, ___ A.3d ___ 2019 WL 4392506 (Pa. Super. 2019) (filed September 13, 2019) (*en banc*). In *K.M.G.*, this Court, sitting *en banc*, stated that, where the trial court appointed counsel to represent the child in a termination case, "we have no authority to delve into the quality of the . . . representation. The Supreme Court has not authorized us to do so." *Id.* at *4. Specifically, we held that

this Court has authority only to raise *sua sponte* the issue of whether the trial court appointed any counsel for the child and not the authority to delve into the quality of the representation.

Here, the trial court appointed Attorney Charles-Asar to represent the Children's legal interests, and Attorney Alfano as the Children's GAL. We find that the trial court properly found the requirements of **L.B.M.** and **T.S.** were satisfied by Attorney Charles-Asar in relation to the November 30, 2017 hearing. She gleaned the preferred outcome of three of the Children through their CASA and GAL, and directly interviewed the fourth child, then interviewed each of the Children in December 2018, after the remand from this Court. Attorney Charles-Asar confirmed that the Children's preferred outcome was that, if they could not be with Mother, then they were happy in foster care and wished to be adopted in their foster care homes. The trial court confirmed that Attorney Charles-Asar adequately represented all four of the Children at the November 30, 2017 hearing with respect to their preferred outcome. Because Mother is raising on appeal the quality of Attorney Charles-Asar's representation of the Children at the November 30, 2017 hearing, we find no merit to Mother's issues 1-4 and 6. **See In re: Adoption of K.M.G.**, **supra**. The trial court proceeded on remand in accordance with the directions in this Court's Memorandum. The court ascertained whether Attorney Charles-Asar carried out her legal duties, and determined that she had done so. The court, deeming a new hearing was not necessary, properly re-entered

- 19 -

its prior decrees, and entered orders changing the Children's permanency goals to adoption. We will not disturb the trial court's determination on appeal.

Finally, Mother contends that DHS failed to meet its burden of proving by clear and convincing evidence that it satisfied 23 Pa.C.S. § 2511(a)(1), (2), (5), or (8), because,

> despite the lower court's use of wide-ranging credibility justifications which are not sufficiently supported by the record[,][5] [Mother's] improved [parenting] abilities were obvious even to DHS' expert witness[, Dr. Russell], who had conducted [Mother's] Parenting Capacity Evaluation a year before the November 2017 trial.
>
> _____
>
> [5] "Most of the testimony was prepared, choreographed and is a connected series of lies, attempted misrepresentations, deceit, all contrived to convince this [c]ourt that [Mother] somehow is a ready, willing and able parent to parent these children. None of her story is believable." (N.T. 11/30/17, p. 328)

Mother's Brief at 16.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. _In re: R.J.T._, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. _Id._ As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon

demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (some citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). As we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.*, quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **See**

***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Section

2511(a) and (b) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

After our careful review of Mother's challenge to the trial court's termination of her parental rights with regard to section 2511(a)(1), (2), (5), and (8), and also the substantive challenge raised in Mother's sixth issue to the termination of her parental rights under section 2511(b) and the change of the Children's permanency goal to adoption under section 6351, we find no merit to her challenges. The trial court's credibility and weight determinations, and its decision to terminate the parental rights of Mother and to change the permanency goal for the Children are supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-827. We, therefore, affirm the termination decrees and goal change

orders on the basis of the well-reasoned opinion of the trial court. ***See*** Trial

Court Opinion, 4/25/19, at 33-48.[6]

_____

[6] Mother argues that the trial court did not consider whether the Agency failed to make reasonable efforts to reunify this family, and whether services and/or assistance were reasonably available for Mother. Mother's Brief at 28, *citing* 42 Pa.C.S.A. § 6301 *et seq.*, and 23 Pa.C.S.A. § 2511(a)(5). She contends that the documented problems with CUA's case management through the filing of the termination and goal change petitions two weeks before the original trial began is tantamount to services and assistance having not been reasonably available to Mother. For the reasons explained in the trial court opinion, we find no merit to Mother's argument concerning CUA's case management amounting to a denial of reasonably available services. ***See*** Trial Court Opinion, 4/25/19, at 35 and 44. Additionally, our Supreme Court has rejected the argument that the provision of reasonable efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child. ***See In the Interest of: D.C.D., a Minor***, 105 A.3d 662, 672-674, 676 (Pa. 2014) (holding, "[n]either subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights"). The Supreme Court noted that, as applicable to section 2511(a)(2), a court may find an agency's lack of assistance to a parent relevant to whether the parent's incapacity "cannot or will not be remedied by the parent." ***Id.*** The Court cited, as an example, a scenario in which a parent is released from a short term of incarceration, stating that the child welfare agency cannot refuse reasonable efforts to an incarcerated parent, and then points to the resulting erosion in the parental bond created by the agency as a justification for the termination of parental rights. ***Id.*** at 672. In distinguishing section 2511(a)(2) from section 2511(a)(5), the Supreme Court noted that, under the latter, the court must consider whether the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time. ***Id.*** at 673. The Supreme Court also rejected the suggestion that section 2511 of the Adoption Act should be read in conjunction with section 6351 of the Juvenile Act, particularly section 6351(f)(9), to conclude that an agency must provide reasonable efforts to enable a parent to reunify with a child prior to the termination of parental rights. ***Id.*** 673-675. In any event, the trial court found no evidence of the Agency withholding reasonable services and/or assistance from Mother in this matter. Thus, based on our Supreme Court's holding in ***In the Interest of: D.C.D., a Minor***, we find no merit to Mother's argument.

As we rely on the trial court's opinion, a copy of said opinion must be attached to any future filings dealing with this appeal.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/25/19

## THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
### IN THE COURT OF COMMON PLEAS

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-DEPENDENCY |
| | : |
| L.M.O., a Minor | : CP-51-AP-0000113-2017/CP-51-DP-0002927-2014 |
| | : |
| S.M.O., a Minor | : CP-51-AP-0000112-2017/CP-51-DP-0002928-2014 |
| | |
| A.A.O., a Minor | : CP-51-AP-0000111-2017/CP-51-DP-0002929-2014 |
| | |
| E.J.O, a Minor | : CP-51-AP-0000114-2017/CP-51-DP-0002931-2014 |
| | |
| | : Superior Court No. 708, 709 EDA 2019, |
| APPEAL OF: | : 710, 711 EDA 2019, 712, 713 EDA 2019, and |
| A.O., Mother | : 714, 715 EDA 2019 Consolidated[1] |

## O P I N I O N

A.O., ("Mother"), appeals from the Orders entered by this Court on February 6, 2019, that affirmed and reinstated the Decrees of Involuntary Termination of Parental Rights and changed the Permanency Goal to Adoption to her four Children: ("L.M.O."), a female, born February 15, 2007; ("S.M.O."), a female, born June 2, 2009; ("A.A.O."), a male, born December 20, 2004, and ("E.J.O."), a male, born May 13, 2011. Original Petitions for Involuntarily Termination of Parental Rights were filed by the Department of Human Services ("DHS"), on January 30, 2017, against both Mother and Father. By separate Decrees entered on November 30, 2017, this Court involuntarily terminated the parental rights of the Children's Mother and Father, M.O. Father did not file Appeals.

---

[1] 4/05/2019, Consolidated Sua Sponte. Comment: Review of these matters indicates that these appeals involve related parties and issues. Accordingly, the appeals at Nos. 708, 709, 710, 711, 712, 713, 714 and 715 EDA 2019 are hereby CONSOLIDATED. See Pa.R.A.P. 513.

1

On July 20, 2018, the Superior Court vacated the Orders terminating Mother's parental rights and remanded the cases for an on-the-record determination as to whether counsel adequately consulted with each Child to determine his or her legal interests in the matter. Superior Court further instructed this court "If the court concludes that counsel did not carry out her legal duties, as espoused in L.B.M., then the court shall order new termination hearings to provide counsel an opportunity to advocate on each Child's behalf. If, however, the court is convinced that counsel fulfilled her duty to each Child, then it may affirm its original termination orders." (154 EDA 2018, 156 EDA 2018, 157 EDA 2018, 158 EDA 2018, filed 7/20/2018).

Mother's parental rights were not terminated as to another Child, M.O., a male, born July 23, 2001, *CP-51-DP-0002930-2014*. This Child is 17 years old and is in placement in a Group Home through St. Francis. Mother's other Child, M.O., a female, born September 3, 1999, *CP-51-DP-0002932-2014*, was discharged from Court Supervision because the Child attained 18 years of age. An Order for Termination of Court Supervision was entered by this Court on 9/27/2017.

In response to the Orders dated February 6, 2019, that reinstated the Decrees of Involuntary Termination of Parental Rights issued on November 30, 2017, Mother, by and through her counsel, filed Notices of Appeal with Statements of Matters Complained of Upon Appeal on March 7, 2019.

2

# STATEMENTS OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother states that the Trial Court erred in the following respects:

1. That the Juvenile Court erred or abused its discretion by denying a trial de novo on the remand;
2. That the Juvenile Court erred or abused its discretion by reinstating the TPR nunc pro tunc;
3. That the Juvenile Court erred or abused its discretion by reinstating the TPR at a status listing, thereby denying mother the opportunity to subpoena her child to testify at an evidentiary hearing as to his/her legal interests;
4. That the Juvenile Court erred or abused its discretion by reinstating the TPR when the child advocate's report indicated a change from when she had originally interviewed one or more of the children; and her report indicated that he/she was not clear about whether or not he/she wished to be adopted;
5. That the Juvenile Court erred or abused its discretion by reinstating the TPR when the child's preferred outcome was not clear;
6. That the child was denied effective assistance of counsel as the child advocate did not advocate for an evidentiary hearing de novo upon the remand in which she could fully participate;
7. That the Juvenile Court erred or abused its discretion in determining that Petitioner, Department of Human Services (DHS), had met its burden of proof by clear and convincing evidence that Mother evidenced a settled purpose of relinquishing her claim to the child or has refused or failed to perform parental duties, for at least six months immediately preceding the filing of the petition;
8. That the Juvenile Court erred or abused its discretion in determining that Petitioner, DHS, had met its burden of proof that Mother has shown repeated and continued incapacity, abuse, neglect or refusal, or that such incapacity, abuse, neglect or refusal causing his child to be without essential parental care, control or subsistence necessary for the child's physical or mental well-being;
9. That the Juvenile Court erred or abused its discretion in determining that Petitioner DHS, had met its burden of proof that the conditions and causes or any such

incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother;

10. That the Juvenile Court erred or abused its discretion in determining that Petitioner, DHS, had met its burden of proof that the conditions which led to the removal of the child continue to exist;

11. That the Juvenile Court erred or abused its discretion in the determining that Petitioner, DHS, had met its burden of proof that the services or assistance reasonably available to Mother are not likely to remedy the conditions which led to the removal of the child within a reasonable period of time and erred or abused its discretion in determining that DHS made reasonable efforts to reunify this family;

12. That the Juvenile Court erred or abused its discretion in the determining that Petitioner, DHS, had met its burden of proof that services or assistance were reasonably available to Mother;

13. That the Juvenile Court erred or abused its discretion in determining that Petitioner, DHS, had met its burden of proof that changing the child's permanency goal to adoption and terminating Mother's rights would best serve the needs and welfare of the child.

## PROCEDURAL HISTORY:

A.M.V., aka A.O. is the "Mother" of, L.M.O., S.M.O., A.A.O., and E.J.O. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "a").

M.O., is the Father of all of the Children, and is listed on their Birth Certificates. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "b").

On December 12, 2014, the Department of Human Services (DHS) received a Child Protective Services (CPS) Report which alleged that Mother and Father's other Child, M.O., a male, attended school that morning with cuts and abrasions on his right

4

ankle and his right hand across his knuckles; that M.O., stated that his parents tried to forcibly keep him from going to school and while trying to get out of the house, he was assaulted by his parents; that Mother then took her crutches and with the help of M.O.'s sister, Mother threw the crutches at M.O.; that the crutches hit M.O, across his right ankle causing an open wound; that this Child stated that this abuse happened often; that this Child stated he was afraid and did not want to go home; that he escaped from the home and went to a neighbor's home; that the neighbor called police; that the police went to the neighbor's home and took this Child back to his home; that the police decided not to leave him at his home and instead, took him to school; that the police did not enter the school to provide any information; that this Child stated that his siblings were attending cyber school. The Report further alleged that the home was filthy with dirty clothes everywhere; that there were ten dogs in the home; that there was a dead dog with dead puppies in the home; that the dogs were allegedly kept in cages and were not let out; and that the parents did not clean up after the dogs and made him clean up after the dogs. The Report also alleged that the parents were unemployed; that Mother uses crutches because of an unknown disability; and that there was an 18 year old sibling in the home who was pregnant. The Report alleged that M.O., attended Luis Munoz-Marin School and was in the seventh grade; that M.O. was a good student who received good grades, was very respectful to his elders and was well-behaved; that M.O., stated he would rather be placed than go back to his home; that there were 3 other siblings of school age who were being kept at home and not allowed to attend school; that physical discipline was used in the home; that the family had a history with DHS; and that M.O., stated that the family always cleaned the home when DHS was coming to the home. (Exhibit "A" Statement of

5

Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "c").

On December 12, 2014, DHS received a supplement to the GPS Report which alleged that the family home was in deplorable and unsanitary condition; that the parents were using excessive and inappropriate methods of discipline. The Report further alleged that about seven Children were observed in the home; that the parents told the police officer that M.O., had behavioral issues; that he ran out of the house that morning because they were disciplining him for punching a hole in the wall; that M.O., stated that his parents yelled at him and locked him in his room; that he stated he did not want to live in the home; that M.O.'s mental health diagnosis was unknown and that he had anger issues; that he punched a hole in a wall because he was upset about a puppy that had died; that he had a minor cut on his hand from punching the wall; and that he was prescribed Adderall. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "d").

On December 12, 2014, DHS received a supplement to the GPS Report which alleged that school counselors were planning to have M.O., transported to DHS and that the Child was to be transported either by school staff or police. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "e").

On December 12, 2014, DHS visited the home and found that there was no heat in the home. There were holes in the walls and doors and trash strewn throughout the house. DHS observed numerous dogs and cats living in unsanitary conditions. Father stated that the Children were all sleeping in the same bedroom due to a leak in the

6

basement which had first begun two month prior. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "f").

On December 12, 2014, DHS obtained an Order of Protective Custody (OPC) for six Children to ensure their well-being and safety. M.O., and M.O., male and female, were placed at Youth Emergency Service (YES). A.A.O., and S.M.O., were placed in Foster Care through Community Umbrella Agency (CUA) NorthEast Treatment Centers (NET). E.J.O., was placed in Foster Care through Concilio, and L.M.O., was placed in Foster Care through New Foundations. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "g").

On December 14, 2014, Mother requested information regarding her Children's whereabouts and Courtroom information regarding the Court Hearing on 12/15/2014. Mother was advised to come to DHS on 12/15/2014, because there would be a CUA safety meeting and she could obtain the name of the worker assigned to the case. Mother stated that she was diagnosed with depression, was receiving therapy, and was prescribed medication. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "h").

At the time the four Children came into care, none of the Children were attending school regularly. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "i").

At the time the four Children came into care, the Children were in need of primary medical and dental care. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "j").

7

Shelter Care Hearings were held on December 15, 2014, for the four Children before the Honorable Allan L. Tereshko. The Court lifted the OPC's, and the legal and physical custody of the Children was transferred to DHS. Placement of the Children in Foster Care through The Net, Concilio, and New Foundations. Children are scheduled for full physical and dental examinations. Parents to have two hour supervised visits, twice a week at the Agency. (Shelter Care Orders, 12/15/2014).

Adjudicatory Hearings were held for the Children on April 20, 2015, before the Honorable Allan L. Tereshko. Children Adjudicated Dependent. Legal Custody of the Children remains with DHS, and placement of the Children remains in Foster Care through New Foundations, Concilio and NET. Mother and Father to have supervised visitation with the Children as arranged by the parties. Mother and Father are referred to BHS for consultations and/or evaluations, and copy of evaluation to be provided to all parties. DHS to refer Mother to PCIT for therapy. Children to remain as committed until the end of the school year. CUA to assist with beds and bedding. Parents to sign and be present for S.M.O., and A.A.O.'s dental surgeries. Children are safe as of 4/16/2015. (Orders of Adjudication and Disposition—Child Dependent, 4/20/2015).

On July 6, 2015, DHS/CUA held an initial Single Case Plan (SCP) Meeting. The parental objectives for Mother were: 1) address and stabilize her mental health by continuing treatment on a consistent basis after psychotropic medications have been discontinued, and to follow all recommendations and comply as directed; 2) to sign release forms for CUA to obtain mental health background information; 3) to attend appointments for Children and to sign releases and consent for treatment; 4) to contact Intellectual Disability Services (IDS) to schedule an intake appointment as

8

recommended; 5) to participate in PCIT; 6) to comply with monthly visits at CUA NET; 7) to attend supervised visits with the Children for 4 hours per week. Both parents were invited to the SCP Meeting but failed to attend and participate. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "n").

Permanency Review Hearings were held on July 24, 2015, for all the Children before Juvenile Hearing Officer, Carol A. Carson. Order entered, legal custody of the Children to remain with DHS, and placement continues in Foster Care. No action taken today, as CUA social worker not available, and must appear and be prepared to testify at next hearing. CUA to provide Mother's psychological evaluation to all parties if it is in their possession. Children to remain as committed. (Permanency Review Orders, 7/24/2015).

On September 14, 2015, a Report was received by the Citywide Community Counseling Services on behalf of Mother. She was diagnosed with Post-Traumatic Stress Disorder (PTSD), Bipolar Disorder, Major Depressive Disorder (MDD), and a learning disability. Mother stated during the assessment that she had a history of drug abuse which included benzodiazepine, opiates, and oxycodone. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "o").

Permanency Review Hearings were held on September 30, 2015, for all the Children before the Honorable Allan L. Tereshko. The Court held that legal custody of the Children remains with DHS, and placement continues in Foster Care. Parents to sign all necessary releases forthwith. Supervised visits at the Agency to continue for parents.

9

CUA to evaluate parent's home, and parents to comply with all services and recommendations. CASA appointed as educational surrogate. CUA to follow up with appropriate evaluation for E.J.O., Ages and Stages and any exposures to lead. His caregivers are authorized to take him for appropriate grooming/haircut. Child referred to BHS for consultation and/or evaluation. (Permanency Review Orders, 9/30/2015).

Permanency Review Hearings were held on December 10, 2015, for all the Children before the Honorable Allan L. Tereshko. The Court held that legal custody of the Children remains with DHS, and placement continues in Foster Care through NET, New Foundations, and A Second Chance. Parents to have weekly supervised visits on Sundays for 2 hours with the Children, and visits may be increased at the discretion of the Agency. Children are medically up-to-date. A.A.O., attends 5th grade with a current IEP, and receives individual weekly therapy through PHMC. He has an autism evaluation scheduled on 12/15/2015. S.M.O., is referred to BHS for consultation and/or evaluations. A request for an IEP is to be made for the Child, and she is to be re-evaluated for her speech, and to have a full eye examination. Mother is referred to BHS for monitoring. CASA is to assist the parents with IEP, and parents are referred for a PCE. Children are safe as of 12/07/2015, and 12/08/2015. (Permanency Review Orders, 12/10/2015).

On January 29, 2016, DHS/CUA held a revised SCP Meeting. The parental objectives for Mother were: 1) address and stabilize her mental health by continuing treatment on a consistent basis after psychotropic medications have been discontinued, and to follow all recommendations and comply as directed; 2) to sign release forms for CUA to obtain mental health background information; 3) to attend appointments for

10

Children and to sign releases and consent for treatment; 4) to contact Intellectual Disability Services (IDS) to schedule an intake appointment as recommended; 5) to participate in PCIT; 6) to comply with monthly visits at CUA NET; 7) to continue supervised visits with the Children for 4 hours per week. Both parents were invited to the SCP Meeting but failed to attend and participate. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "s").

Permanency Review Hearings were held on March 9, 2016, for all the Children before the Honorable Allan L. Tereshko. The Court held that legal custody of the Children remains with DHS, and placement continues in Foster Care through Children's Choice, Concilio, and A Second Chance. Mother and Father were evicted from their home. Parents' current address is 944 E. Tioga St., Philadelphia, PA 19143, residing with Maternal Grandmother. Parents' visitation is reduced to Supervised at the Agency every other week for 2 hours each visit. Mother is engaged in weekly therapy through City Wide. Children are medically up-to-date. A.A.O., is diagnosed with Autism, and receives mobile and behavioral therapy through PHMC. S.M.O.'s evaluation is accepted into the record as evidence. E.J.O., was evaluated by Ages and Stages, and he attends daycare. L.M.O., is doing well in school. CASA Report is accepted into the record as evidence. Both parents are to attend scheduled PCE appointments on 5/10/2016, and 5/11/2016. Children are safe as of 2/14/2016, and 2/08/2016. (Permanency Review Orders, 3/09/2016).

On April 21, 2016, DHS/CUA held a revised SCP Meeting. The parental objectives for Mother were: 1) to attend appointments for Children and to sign releases

11

and consent for treatment; 2) to sign releases and consent for treatment for the Children; 3) to obtain mental health background information; 4) to participate in court ordered Parenting Capacity Evaluation (PCE); 5) to participate in family functional therapy; 6) to participate in Parent Child Interaction Therapy (PCIT); 7) to comply with monthly visits at CUA NET; 8) to obtain and maintain suitable housing; and 9) continue supervised visits with the Children for 2 hours per week. Both parents were invited to the SCP Meeting but failed to attend and participate. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "u").

On May 4, 2016, a Report was received from ARC. A referral to ARC services was made for Mother on 4/28/2016. ARC offered services to Mother, however, Mother declined the services. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "v").

Permanency Review Hearings were held on June 1, 2016, for all the Children before the Honorable Allan L. Tereshko. The Court held that legal custody of the Children remains with DHS, and placement continues in Foster Care through New Foundations, Concilio, and A Second Chance. Parents' visitation is biweekly, supervised at the Agency. Mother is re-referred to BHS for monitoring, and is to make copies of documents that she will submit to CUA. Parents to sign all necessary consents, and to complete part 2 of PCE. L.M.O., is medically up-to-date and receives individual counseling through Wedge. She is in need of eyeglasses, and CUA is to follow up with DHS insurance unit for her glasses. CUA to follow up with Mother for OVR, (Office of Vocational Rehabilitation) completion, and to assess parents' housing. S.M.O., is up to date with medical and dental. She has a current IEP, and was referred to The Wedge.

12

A.A.O., is medically up to date, and there is a possibility the Child may be going blind in one of his eyes. CUA is to ensure the parents are aware of the Child's medical appointments and concerns of his eye. Child is to attend vision appointment on 6/15/2016. E.J.O., is medically up to date, and referred for trauma therapy. He has an eye appointment of 6/15/2016, as there are concerns about his vision. Children are safe as of 5/07/2016, and 5/12/2016. (Permanency Review Orders, 6/01/2016).

On July 20, 2016, DHS/CUA held a revised SCP Meeting. The parental objectives for Mother were: 1) to attend appointments for Children and to sign releases and consent for treatment; 2) to sign releases and consent for treatment for the Children; 3) to sign release forms for CUA to obtain mental health background information; 4) to participate in court ordered Parenting Capacity Evaluation (PCE); 5) to participate in family functional therapy; 6) to participate in PCIT; 7) to comply with monthly visits at CUA NET; 8) to obtain and maintain suitable housing; and 9) continue supervised visits with the Children for 2 hours per week. Both parents were invited to the SCP Meeting but failed to attend and participate. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "x").

On August 18, 2016, DHS received a Drug Analysis Report from Atlantic Diagnostic Laboratories on Mother. She tested positive for benzodiazepines, opiates, and oxycodone. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "z").

On September 12, 2016, a Closing Summary Report from ARC was received for Mother. She presented at ARC on 8/05/2016, for parenting education. Mother did not return to ARC to complete her orientation and calendar appointment with the

13

Reunification Support Specialist (RSS). On 9/01/2016, ARC outreach staff contacted Mother and scheduled her to return 9/09/2016, to complete her calendar appointment with the RSS. Mother was a no call, no show on that date. On 9/12/2016, ARC closed Mother's file for non-participation in ARC services. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "aa").

Permanency Review Hearings were held on September 19, 2016, for all the Children before the Honorable Allan L. Tereshko. The Court held that legal custody of the Children remains with DHS, and placement continues in Foster Care. Court grants a brief continuance, and Status Quo remains on all cases. (Permanency Review Orders, 9/19/2016).

On October 6, 2016, a Substance Analysis Unit Report was received on behalf of Mother. She tested positive for opiates. (Exhibit DHS #7, & Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "cc").

On October 17, 2016, a PCE Report was completed pertaining to Mother. The Analysis of Functioning by Dr. William Russell determined that Mother does not identify the role she played or have any insight into the removal of the Children or their ongoing placement. Mother reported that the only issue with her housing at the time of the Children's removal was the size of the house, while records reflect extremely deplorable living conditions. While Mother is currently enrolled in mental health treatment, it does not appear that she has been working on the issues that would help her develop the insight into her role in the Children's removal and ongoing treatment. Furthermore,

14

Mother's presentation during the evaluation was an appearance of being disoriented with somewhat of a glazed look. It is for these reasons that Mother does not present with the capacity to provide safety and/or permanency to her Children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "ee").

Permanency Review Hearings were held on October 25, 2016, for all the Children before the Honorable Allan L. Tereshko. The Court held that legal custody of the Children remains with DHS, and placement continues in Foster Care. Mother and Father are to continue to have supervised bi-weekly visits with the Children at the Agency. All contact between Mother or Father and the Children outside of the current visitation schedule is to cease. Mother receives mental health treatment through City Wide, however, has not completed parenting classes or housing through ARC. CUA has not been able to assess the parent's home. Mother and Father completed part 2 of the PCE. Mother referred to CEU forthwith for drug screen, dual diagnosis, and assessment to include alcohol and 3 random drug screens prior to next court date. Mother to provide prescription to the CUA worker and to CEU. Children attend WEDGE weekly for therapy, and are medically up-to-date. Children are safe as of 10/04/2016 and 10/06/2016. (Permanency Review Orders, 10/25/2016).

On November 28, 2016, and December 13, 2016, Mother tested positive for benzodiazepines and opiates at the CEU. (Exhibit DHS #7, & Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "gg").

On December 19, 2016, DHS/CUA held a revised SCP Meeting. The parental objectives for Mother were: 1) to be consistent with her visitation; 2) to participate in court ordered services; 3) to permit CUA to assess her home for inspection per Court Order; 4) to attend City Wide Mental Health and follow all recommendations; 5) to provide CUA with documentation on her Children's birth certificates and social security cards; and 6) to complete 3 random drug screens as per Court Order. Both parents were invited to the SCP Meeting but failed to attend and participate. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 1/30/2017, ¶ "hh").

Permanency Review Hearings were held on February 15, 2017, for all the Children before the Honorable Allan L. Tereshko. The Court held that legal custody of the Children remains with DHS, and placement continues in Foster Care. CUA is to conduct re-evaluation of Father's home. Mother referred to CEU forthwith for drug screen, dual diagnosis, and assessment to include alcohol and 2 random drug screens prior to next court date. Mother to provide prescription to the CUA worker and to CEU. CUA to continue to contact Mother's prescribers in order to implement medication recommendations of Mother's PCE. All recommendations of Mother and Father's PCEs to be implemented, CUA to facilitate, and Parents are to cooperate. Mother and Father to sign releases of information and BHS to monitor parent's treatment. Foster parents and current visitation coach to appear at next court listing. Children are safe as of 2/13/2017 and 2/14/2017. (Permanency Review Orders, 2/15/2017).

Permanency Review Hearings were held on April 11, 2017 for all the Children before the Honorable Allan L. Tereshko. The Court held that legal custody of the

Children remains with DHS, and placement continues in Foster Care. Status Quo. Court grants a continuance. Mother re-referred to CEU forthwith for drug screen, dual diagnosis, and assessment to include alcohol and 2 random drug screens prior to next court date. Mother to provide prescription to the CUA worker and to CEU. All recommendations of Mother and Father's PCEs to be implemented, and parents to comply. Parents to sign all necessary releases, consents, all previous court orders stand. Children are safe as of 3/28/2017 and 3/29/2017. (Permanency Review Orders, 4/11/2017).

A Status Review Hearing was held on August 16, 2017, for all the Children before the Honorable Allan L. Tereshko. Mother's counsel and CUA social worker are unavailable. All counsel attached for the next listing. DHS commitment stands. (Status Review Orders, 8/16/2017).

**TERMINATION HEARING**

On November 30, 2017, this Court held a Trial de Novo, Contested Termination of Parental Rights Hearings and Goal Change Hearings for all four Children pertaining to Mother's and Father's parental rights. The Court also heard evidence regarding another Child, M.O., 16 years and 4 months of age, *CP-51-DP-0002930-2014*, however, this was only a Permanency Review Hearing and DHS did not file a petition to terminate parental rights as to this Child. Mother attended the hearing on 11/30/2017, and was represented by counsel, Maureen F. Pié, Esquire. Also present at this hearing were the Child Advocate, Regina Charles-Asar, Esquire, and the Guardian Ad Litem, Adrianna Alfano, Esquire.

17

Bridget Warner, counsel for DHS called the first witness to testify, Dr. William Russell, Forensic Psychologist at Forensic Mental Health Services. All counsel stipulated to Dr. Russell's qualifications as a specialist in Parenting Capacity. He testified he conducted a PCE, (Parenting Capacity Evaluation) on both Mother and Father. Mother's Forensic Evaluation was conducted on October 17, 2016, which involved a review of the records and a meeting with Mother on October 4, 2016. He opined that he identified multiple barriers to Mother's capacity to provide both safety and permanency for her Children. Based on the information provided as well as her own report, Mother does not identify the role she played or any insight into the removal of the Children or their ongoing placement. Mother reported the only issue at the time of the removal was the size of the house, while records reflect extremely deplorable living conditions. Mother reflects a significant degree of minimization and denial of any problems. Mother denied physically abusing her son, and blames an older sibling of abusing him. Mother minimizes her responsibility for the Children's issues and problems and their placement. While Mother appears to be enrolled in mental health treatment, it does not appear that she has been working on the issues that would help her develop the insight into her role in the Children's removal and ongoing placement. (N.T., 11/30/2017, p.58 at 11-25; p.59 at 1-25; p.60 at 1-25; p.61 at 1-6; p.62 at 11-25; p.63 at 1-2).

Dr. Russell testified that Mother presented for the interview and appeared very glazed and had difficulty staying on topic. She appeared to possibly be using too much medication. She had difficulty in maintaining eye contact with anyone, and in conjunction with the records he reviewed, Mother described using significant amounts of

18

narcotics. She described using Percocet for pain in her legs from a car accident and using Xanax and Zoloft from her psychiatrist at City Wide. Dr. Russell recommended that Mother should participate in random drug screens based on records he reviewed as well as the way she presented at the interview. (N.T., 11/30/2017, p.63 at 3-25; p.64 at 1-25).

Dr. Russell testified he made other recommendations for Mother to assist her to be able to provide safety and permanency for her Children. Mother was unable to describe any types of problems her Children were experiencing, instead stating they were fine, in general. Therefore, he recommended Mother should continue to attend individual therapy and also participate in her Children's treatments to ensure she is aware of their on-going behavioral and emotional needs. He also recommended the parents maintain appropriate housing for the Children, and that on-going inspections should be conducted for a period of not less than six months. This was because Mother minimized any type of problem in the prior residence, whereas, Father, had described some significant problems in the house. He was concerned with the current residence on Water Street, and that they must maintain this home better than what was described by police officers and social workers at the previous home. (N.T., 11/30/2017, p.61 at 7-25; p.62 at 11-25; p.64 at 17-25; p.65 at 1-25).

On cross-examination by Adrianna Alfano, GAL, Dr. Russell noted that part of the role of a parent in providing safety and permanency is addressing any needs that an individual Child has, and Mother never displayed appropriate insight as to why her Children were in care, and what their issues were. Mother could not identify which school each Child was attending. Dr. Russell testified he was also concerned with Mother's following the prescriptions as prescribed. He expressed concern that Mother

19

may be prescription shopping, going to different doctors for different medications without one doctor being aware of the other. He opined that Mother may be over medicating herself. (N.T., 11/30/2017, p.67 at 22-25; p.68 at 1-25; p.69 at 1-25; p.70 at 1-16).

Dr. Russell concluded that based on his evaluation and review of the records, Mother's history of dependence, history of difficulties in maintaining her house, the fact that the Children were removed and out of her care for several years, that she has a diagnosis of post-traumatic stress disorder and bipolar disorder, that Mother is on antipsychotic medication, is certain Mother should be going to treatment at least once a week instead of twice a month. Based on all the evidence he reviewed and obtained himself, Dr. Russell sees no evidence presented that reflects a significant change in Mother's day to day functioning. Therefore, his opinion today would be the same as it was at the time of the evaluation, Mother does not present with the capacity to provide safety and/or permanency to her Children. (N.T., 11/30/2017, p.72 at 19-25; p.73 at 1-17).

On cross-examination by Mother's attorney, Maureen Pié, Dr. Russell was questioned about Case Manager, Martha Rios, who was removed from her job because of unprofessional conduct. He stated that the information provided by Ms. Rios was really superfluous in that she talked about lateness. Ms. Rios referred to one incident of a blow up. But if you remove that from the report, the totality of all the other information including Mother's presentation, her history of mental health, the fact that the Children were removed, it is not going to change his opinion about Mother's incapacity to provide

20

safety and/or permanency to her Children. (N.T., 11/30/2017, p.89 at 13-25; p.90 at 1-25).

On re-direct examination by DHS attorney, Ms. Warner, Dr. Russell noted documents he received in order to form his opinion, including ARC reports, and other contacts and that CUA representatives were merely conduits for the information. And based on the statements Mother made today, he would not recommend an update to the PCE at this time. Mother continues to use prescription drugs, does not have appropriate housing and is only attending individual therapy once per month is a continuing concern. He noted that Mother's use of narcotics on a long-term basis is sustenance to addiction. The diagnoses that Mother states that justify those medications clearly indicates a need for treatment. (N.T., 11/30/2017, p.97 at 19-25; p.98 at 1-25; p.99 at 1-25; p.100 at 1-25).

Next to testify was Laura Herschel, CBH-Critical Care Manager. She testified she was assigned to help with mental health, and drug and alcohol recommendations. She stated she had billing information that Mother participated in mental health services at City Wide for therapy sessions fifteen times in the last twelve months, and that Mother saw the psychiatrist at City Wide five times within the last twelve months. (N.T., 11/30/2017, p.101 at 17-25; p.102 at 1-15).

On cross-examination by Ms. Pié, Mother's counsel, Ms. Herschel indicated that the records reflect billing dates, not necessarily dates of attendance. She noted billing dates for therapy sessions, visits with psychiatrist, and medication management. She noted the last record they had was 3/22/2017, when Mother was prescribed Prazolam,

21

which is generic Xanax. (N.T., 11/30/2017, p.102 at 23-25; p.103 at 1-25; p.104 at 1-25; p.105 at 1-12).

On cross-examination by Ms. Alfano, GAL, Ms. Herschel testified Mother was last prescribed oxycodone on 4/07/2016. She noted that nothing on the billing records would substantiate or indicate why Mother was taking oxycodone as recently as two months ago. She noted her records end on 3/22/2017, so nothing would indicate why Mother was currently taking Abilify or Xanax. (N.T., 11/30/2017, p.108 at 5-19).

Mariam Colon, Case Manager at NET-CUA, was next to testify. She noted she was the first manager in the case in December 2014, and was managing the case until August 2015. She stated the Children came into care when the oldest boy, M.O., went to school with bruises on his knuckles, scars and an open cut. He stated his parents used inappropriate discipline and they did not let him attend school, so he escaped and went to a neighbor's home. The neighbor then contacted police, and police contacted DHS. (N.T., 11/30/2017, p.110 at 22-25; p.111 at 1-25; p.112 at 1-25; p.113 at 1-9).

Ms. Colon testified that the Children were not attending school, were not medically up-to-date, and had vision and dental care issues. S.M.O., had the most dental problems and required oral surgery at the time. She stated at the start Mother would call her approximately 20 times per day, complaining about everything regarding her Children. She was cooperative to a certain point, would meet with her, however, when she needed to sign releases of information, she would not show up or just outright refuse to sign. The SCP objectives for Mother were to address and stabilize her mental health, to obtain mental health and behavioral health evaluation, and receive treatment. She was also to maintain appropriate and suitable housing and attend the supervised visits with her

22

Children. (N.T., 11/30/2017, p.113 at 10-25; p.114 at 1-25; p.115 at 1-25; p.116 at 1-25; p.117 at 1-2; p.118 at 1-25; p.119 at 1-25; p.120 at 1-21).

Ms. Colon testified Mother was minimally compliant with objectives during the period when she was manager. She supervised two visits between the parents and the Children, and stated the parents would bring food and the visits were appropriate. The Agency provided the parents with beds and sheets and pillows in anticipation of reunification. Ms. Colon never recommended reunification because the parents were not compliant with objectives, not obtaining mental health treatment, not attending educational appointments for the Children, not attending the Children's medical appointments, and the parents would not contact her regarding their Children's medical care. (N.T., 11/30/2017, p.123 at 4-25; p.124 at 1-25; p.125 at 1-25; p.126 at 1-25; p.127 at 1-18).

Kesa Lewis, Case Manager Supervisor-NET/CUA, was the next witness to testify. She began supervising these Children's cases in February 2016, and remained Supervisor until earlier this month, November 2017. She testified she met with the parents in August 2016, because there were some incidents during visitations when Mom was deemed as incoherent, and we required, and Mother brought in, a document from her pharmacy showing the medications she had received. She also explained the parental objectives to the parents and they signed the SCP's. (N.T., 11/30/2017, p.150 at 21-25; p.151 at 1-25; p.152 at 1-25; p.153 at 1-25; p.154 at 1-25).

Ms. Lewis testified that in her role as Case Manager Supervisor she supervised Martha Rios, a one-time worker on the Children's cases. She noted she had no reason to believe at any time that Ms. Rios was relaying information to her that was untruthful, and

23

she had no concerns regarding her management of the Children. She noted that Mother was noncompliant with the objectives because Mother was not willing to do the necessary things that were needed in order for her to be reunited with her Children. That included not signing releases, and not keeping appointments for the Agency to inspect their residence. She noted that the parents did not contact her to inquire about the medical or educational issues regarding their Children, until several weeks ago when Mother contacted her regarding visits. (N.T., 11/30/2017, p.159 at 1-25; p.160 at 1-25; p.161 at 1-25; p.162 at 1-8).

On cross-examination by Adrianna Alfano, GAL, Ms. Lewis testified that Frank Cervantes took over as Case Manager for the Children in February 2017, after Ms. Rios was removed in January 2017. She testified that during the period between February 2016 to the present, to her knowledge, Mother has not completed a course of mental health treatment. She also stated Mother indicated that she had problems with her legs and that was the reason she needed so many pain medications. (N.T., 11/30/2017, p.162 at 13-25; p.163 at 1-25; p.164 at 1-25; p.166 at 24-25; p.167 at 1-3).

Ann Umbrecht, Educational Decision Maker, was the next witness to testify. She stated she was appointed for three of the four Children: L.M.O., S.M.O., and A.A.O. She testified she attends school meetings, helps to initiate evaluations to determine special education needs, attends parent-teacher conferences, and acts as a de facto parent with respect to educational issues. She noted that these three Children are placed together with Foster Parent, N.P., and that she and the Foster Parent have frequent contact and described her as her "partner" in terms of getting the Children what they need from the various schools. (N.T., 11/30/2017, p.218 at 14-2; p.219 at 1-25; p.220 at 1-24).

24

Ms. Umbrecht further testified that she has observed interactions between the Children and the Foster Parent, N.P., and characterizes their interactions as those of a natural parent because they have a relaxed, warm relationship. The Children referred to the Foster Parent as "grandma", however recently two of the three Children have begun referring to her as "mom." (N.T., 11/30/2017, p.218 at 16-25; p.219 at 1-23; p.220 at 17-25; p.221 at 1-25; p.222 at 1-11).

Frank Cervantes, CUA Case Manager, was the next witness to testify. He stated he began working on the Children's cases in February 2017, and the case objectives for Mother were participation in ARC, completing random drug screens, completing CEU assessments, signing releases, attending therapy, taking medications as prescribed, attend two supervised visits per month with the Children, and follow the recommendations from her PCE. (N.T., 11/30/2017, p.229 at 3-25; p.230 at 1-25).

Mr. Cervantes testified that he received a letter from ARC dated 7/10/2017, stating the agency made several attempts to contact Mother, and Mother had not complied with the referral. He stated he notified and requested Mother appear at CEU for random drug tests, as ordered by the Court. Again Mother did not comply, and did present him with a list of her prescribed medications, however, he has no record of Mother presenting that list to CEU. Regarding Mother's mental health objective, she has only minimally complied because she does not consistently attend her therapy. Mr. Cervantes noted he had difficulty in assessing the condition of the parent's residence. He recalled meeting Mother at the house at 3011 N. Water Street, and Mother stated she did not live there, but lived with her mother. He then assessed maternal grandmother's home in September 2017, and Mother was sharing a room with her older daughter, and there

25

was no space for the Children to stay, therefore, the house was not suitable for reunification. (N.T., 11/30/2017, p 233 at 1-16; p.234 at 10-25; p.235 at 1-25; p.236 at 1-25; p.237 at 1-25; p.238 at 1-18).

Mr. Cervantes also testified that Mother was minimally compliant with visitation. Mother missed visits, one in September, one in October, and missed two visits in November. He observed a visit on March 29, 2017, and he noted that Mother was emotionally distraught during the visit because she recently had a death in her family and was upset. She brought dinner and the family ate dinner together. He noted the Children have no difficulty separating from the parents when the visits are over. (N.T., 11/30/2017, p.242 at 12-25; p.243 at 1-25; p.244 at 1-18).

Mr. Cervantes stated he visits the Children in their foster homes at least once per month, and sometimes multiple times. L.M.O., S.M.O., and A.A.O., are placed together with Foster Parent, N.P., who is the pre-adoptive resource. He opined the Children and Foster mother have a very strong bond, and rely on N.P. for all their needs and safety. Regarding E.J.O., who is placed separately, he visits him once a month at his Foster home. He opined that the Children are strongly bonded with the Foster Parents, and with the other kids in the Foster home, and characterized the relationship as "beautiful." He opined that all four Children would not suffer irreparable harm if Mother's parental rights were terminated and it would be in their best interest to be placed into adoption. All the Children are strongly bonded to their Foster Parents and he has seen improvement in the Children over the time period he has managed their cases. A.A.O., told him he was not able to return to his parents, and wanted to be adopted by his Foster Parent. (N.T., 11/30/2017, p.245 at 7-25; p.246 at 1-5, 8-25; p.247 at 1-23; p.248 at 1-25; p.249 1-22).

On cross-examination by Ms. Alfano, GAL, Mr. Cervantes stated he considered Mother's housing status as "transient", and would not recommend the Children be returned to Mother's care. Mother is unstable in housing and unstable mentally. She is also using narcotics, and has been unable to show she is a responsible parent. (N.T., 11/30/2017, p.250 at 1-25; p.252 at 3-21).

Mother was the next witness to testify, and stated she currently lives at 3011 N. Water Street, Philadelphia, PA. She noted that once Father is released from incarceration, and if the Children are reunited with him, she would move back to her Mother's house where she lived with her older daughter. She stated she attended two visits with her Children in October, however, missed a visit in November because of her nephew's funeral. She also stated her visits were stopped because she allowed her older daughter and maternal grandmother to visit with the Children, and was told that was not allowed. (N.T., 11/30/2017, p.290 at 1-25; p.291 at 1-25; p.294 at 6-25; p.295 at 1-11; p.296 at 1-24; p.297 at 1-24).

Mother also stated that she attends mental health therapy at City Wide once a week, then now ordered to go twice every other week. She notes she has missed some therapy appointments because her nephew was killed, and she is scheduled for 23rd surgery on her legs. Mother claims she is not taking any pain medications now so she can obtain custody of her Children. She does take three medications: Abilify, Zoloft and Xanax. She noted she gets her prescriptions from Dr. Mint at City Wide, where she sees him every other month. (N.T., 11/30/2017, p.299 at 1-15; p.300 at 1-25; p.301 at 1-25).

Regarding her drug screens, Mother stated she completed all of the screens that Mr. Cervantes asks her to, and also signed releases for him to obtain all of the results and

27

reports but did not give him the paperwork personally. She reported the CEU told her she could not be seen because there was no space available. Mother admitted she would get very sleepy when she was on pain medications and had trouble focusing. Mother stated she did not complete parenting classes at ARC because she was never told to attend up until the month of November 2017. (N.T., 11/30/2017, p.302 at 1-25; p.303 at 1-25; p.304 at 1-25; p.305 at 1-4).

Mother stated, if given another chance, she would do everything possible and what she was supposed to do to get her Children back. She would care for them, make sure they go to doctors, school, and graduate from high school. She testified she knew someone was appointed to make decisions for her Children regarding education, and stated she was told that she was not allowed to know information about her Children's schooling. Mother stated she has suitable housing with furniture, bedding, dressers, clothing, and running water and hot water. Mother could not produce a lease, and stated she would be receiving the lease tomorrow. (N.T., 11/30/2017, p.305 at 5-25; p.306 at 1-25; p.308 at 1-13; p.309 at 1-25; p.310 at 1-13).

On cross-examination by Ms. Warner, DHS attorney, Mother admitted to living with her older daughter for approximately two months, after she was terminated from court supervision, however, the daughter has not enrolled in school yet. Mother stated she receives Social Security Disability income. Mother also admitted she was aware she was supposed to attend services at ARC as far back as August 2016, however, stated she was told she did not have to complete parenting classes because Father had already completed it. Finally, when questioned by Ms. Alfano, GAL, Mother stated she did not

28

tell Dr. Russell that she had completed a parenting class at ARC. (N.T., 11/30/2017, p. 311 at 24-25; p.312 at 1-8; p.313 at 1-4; p.318 at 1-19; p.319 at 1-20; p.325 at 24-25; p.326 at 1-7).

## HEARING FEBRUARY 6, 2019

This Court was instructed by the Superior Court in a Memorandum Order dated 7/20/2018 to conduct an "on-the-record determination as to whether counsel adequately consulted with each Child and determined his or her legal interests in the matter. If the Court concludes that counsel did not carry out her legal duties, as espoused in L.B.M., then the Court shall order a new termination hearing to provide counsel an opportunity to advocate on each Child's behalf. If, however, the Court is convinced that counsel fulfilled her duty to each Child, then it may reaffirm its original termination order." (Superior Court Decision, 7/20/2018, 154, 156, 157 EDA 2018, pg. 10).

At a hearing on December 12, 2018, this Court ordered Regina Charles Asar, Esquire, Child Advocate, to meet with and speak to the Children prior to the next court date. (Permanency Review Order, 12/12/2018).

On February 6, 2019, this Court held a hearing and Regine Charles Asar, Esquire, Child Advocate, testified she had seen A.O., L.O., and S.O. on 12/17/2018, and saw E.O. on 12/20/2018. She stated the Children had represented to her that they were happy where they were at and wanted to stay there and be adopted. Further, she testified that that that was the Children's position at the time of the termination hearing on November 30, 2017. (N.T., 2/06/2019, p.3 at 11-25; p.4 at 1-15).

29

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T.* 91 A.3d 197 Pa.Super.2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and

30

convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

These Children came to the attention of the DHS on December 12, 2014, when the Department of Human Services (DHS) received a Child Protective Services (CPS) Report which alleged that Mother and Father's other Child, M.O., a male, attended school that morning with cuts and abrasions on his right ankle and his right hand across his knuckles; that M.O. stated that his parents tried to forcibly keep him from going to school and while trying to get out of the house, he was assaulted by his parents; that Mother then took her crutches and with the help of M.O.'s sister, Mother threw the crutches at M.O.; that the crutches hit M.O., across his right ankle causing an open wound; that this Child stated that this abuse happened often; that this Child stated he was afraid and did not want to go home; that he escaped from the home and went to a neighbor's home; that the neighbor called police; the Report further alleged that the home

31

was filthy with dirty clothes everywhere; that there were ten dogs in the home; that there was a dead dog with dead puppies in the home; that the dogs were allegedly kept in cages and were not let out; and that the parents did not clean up after the dogs and made him clean up after the dogs. The Report also alleged that the parents were unemployed; that Mother uses crutches because of an unknown disability; and that there was an 18 year old sibling in the home who was pregnant. The Report alleged that M.O., stated he would rather be placed than go back to his home; that there were 3 other siblings of school age who were being kept at home and not allowed to attend school; that physical discipline was used in the home; that the family had a history with DHS. On December 12, 2014, DHS received a supplement to the GPS Report which alleged that the family home was in deplorable and unsanitary condition; that the parents were using excessive and inappropriate methods of discipline. The Report further alleged that about seven Children were observed in the home. On December 12, 2014, DHS visited the home and found that there was no heat in the home. There were holes in the walls and doors and trash strewn throughout the house. DHS observed numerous dogs and cats living in unsanitary conditions. Father stated that the Children were all sleeping in the same bedroom due to a leak in the basement which had first begun two months prior. On December 12, 2014, DHS obtained an Order of Protective Custody (OPC) for six Children to ensure their well-being and safety. M.O., and M.O., male and female, were placed at Youth Emergency Services (YES). A.A.O., and S.M.O., were placed in Foster Care through Community Umbrella Agency (CUA) NorthEast Treatment Centers (NET). E.J.O., was placed in Foster Care through Concilio, and L.M.O., was placed in Foster Care through New Foundations.

## The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence to Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5), and (8) [2]

Involuntary termination of parental rights is governed by §2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evident." *In re T.R., 465 A.2d 642, 644 (Pa. 1983).* Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester, 555 A.2d 1202, 1203-04 (Pa. 1989).*

Mother's Concise Statement of Matters Complained of on Appeal alleges that the Trial Court erred when it found that DHS by clear and convincing evidence had met its burden to terminate Mother's parental rights under 23 Pa.C.S.A. §2511 (a)(1), (2), (5),

---

[2] 1(a) General Rule.—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

33

and (8). This Court disagrees.

This Court heard clear and convincing evidence from Mariam Colon, Case Manager at NET-CUA. She noted she was the first manager in the case in December 2014, and was managing the case until August 2015. She stated the Children came into care when the oldest boy, M.O., went to school with bruises on his knuckles, scars and an open cut. He stated his parents used inappropriate discipline and they did not let him attend school, so he escaped and went to a neighbor's home. The neighbor then contacted police, and police contacted DHS. Ms. Colon testified that the Children were not attending school, were not medically up-to-date, and had vision and dental care issues. S.M.O., had the most dental problems and required oral surgery at the time. She stated at the start Mother would call her approximately 20 times per day, complaining about everything regarding her Children. She was cooperative to a certain point, would meet with her, however, when she needed to sign releases of information, she would not show up or just outright refused to sign. The SCP objectives for Mother were to address and stabilize her mental health, to obtain mental health and behavioral health evaluations, and receive treatment. She was also to maintain appropriate and suitable housing and attend the supervised visits with her Children. Ms. Colon testified Mother was minimally compliant with objectives during the period when she was manager. She supervised two visits between the parents and the Children, and stated the parents would bring food and the visits were appropriate. Ms. Colon never recommended reunification because the parents were not compliant with objectives, not obtaining mental health treatment, not attending educational appointments for the Children, not attending the

34

Children's medical appointments, and the parents would not contact her regarding their Children's medical care.

Next, the Court heard credible testimony from Kesa Lewis, Case Manager Supervisor-NET/CUA. She began supervising these Children's cases in February 2016 and remained supervisor until Frank Cervantes took over. She testified she met with the parents in August 2016, because there were some incidents during visitations when Mom was deemed as incoherent, and was required and Mother brought in a document from her pharmacy showing the medications she had received. She also explained the parental objectives to the parents and they signed the SCP's. Ms. Lewis testified that in her role as Case Manager Supervisor she supervised Martha Rios, a one-time worker on the Children's cases. She noted she had no reason to believe at any time that Ms. Rios was relaying information to her that was untruthful, and she had no concerns regarding her management of the Children. She noted that Mother was noncompliant with the objectives because Mother was not willing to do the necessary things that were needed in order for her to be reunited with her Children. That included not signing releases, and not keeping appointments for the Agency to inspect their residence. She noted that the parents did not contact her to inquire about the medical or educational issues regarding their Children, until several weeks ago when Mother contacted her regarding visits.

Frank Cervantes, CUA Case Manager, also provided credible testimony that he began working on the Children's cases in February 2017, and the case objectives for Mother were participation in ARC, completing random drug screens, completing CEU assessments, signing releases, attending therapy, taking medications as prescribed, attend two supervised visits per month with the Children, and follow the recommendations from

35

her PCE. He testified he received a letter from ARC dated 7/10/2017, stating the Agency made several attempts to contact Mother, and Mother had not complied with the referral. He stated he notified and requested Mother appear at CEU for random drug tests, as ordered by the Court. Again Mother did not comply, and did present him with a list of her prescribed medications, however, he has no record of Mother presenting that list to CEU. Regarding Mother's mental health objective, she has only minimally complied because she does not consistently attend her therapy. Mr. Cervantes noted he had difficulty in assessing the condition of the parent's residence. He recalled meeting Mother at the house at 3011 N. Water Street, and Mother stated she did not live there, but lived with her mother. He then assessed maternal grandmother's home in September 2017, and Mother was sharing a room with her older daughter, and there was no space for the Children to stay, therefore, the house was not suitable for reunification. Mr. Cervantes also testified that Mother was minimally compliant with visitation. Mother missed visits, one in September, one in October, and missed two visits in November. He observed a visit on March 29, 2017, and he noted that Mother was emotionally distraught during the visit because she recently had a death in her family and was upset. She brought dinner and the family ate dinner together. He noted the Children have no difficulty separating from the parents when the visits are over.

This Court also heard the credible, clear and convincing expert testimony from Dr. William Russell, Forensic Psychologist. He testified he conducted Parenting Capacity Evaluations on both Mother and Father. Mother's Forensic Evaluation was conducted on October 17, 2016, which involved a review of the records and a meeting with Mother on October 4, 2016. He opined that he identified multiple barriers to

36

Mother's capacity to provide both safety and permanency for her Children. Based on the information provided as well as her own report, Mother does not identify the role she played or any insight into the removal of the Children or their ongoing placement. Mother reported the only issue at the time of the removal was the size of the house, while records reflect extremely deplorable living conditions. Mother reflects a significant degree of minimization and denial of any problems. Mother denied physically abusing her son, and blames an older sibling of abusing him. Mother minimizes her responsibility for the Children's issues and problems and their placement. While Mother appears to be enrolled in mental health treatment, it does not appear that she has been working on the issues that would help her develop the insight into her role in the Children's removal and ongoing placement.

Dr. Russell testified that Mother presented for the interview and appeared very glazed and had difficulty staying on topic. She appeared to possibly be using too much medication. She had difficulty in maintaining eye contact with anyone, and in conjunction with the records he reviewed, Mother described using significant amounts of narcotics. She described using Percocet for pain in her legs from a car accident and using Xanax and Zoloft from her Psychiatrist at City Wide. Dr. Russell recommended that Mother should participate in random drug screens based on records he reviewed as well as the way she presented at the interview.

Dr. Russell testified he made other recommendations for Mother to assist her to be able to provide safety and permanency for her Children. Mother was unable to describe any types of problems her Children were experiencing, instead stating they were fine, in general. Therefore, he recommended Mother should continue attending

37

individual therapy and also participate in her Children's treatments to ensure she is aware of their on-going behavioral and emotional needs. He also recommended the parents maintain appropriate housing for the Children, and that on-going inspections should be conducted for a period of not less than six months. This was because Mother minimized any type of problem in the prior residence, whereas, Father, had described some significant problems in the house. He was concerned with the current residence on Water Street, and that they must maintain this home better than what was described by police officers and social workers at the previous home.

Dr. Russell noted that part of the role of a parent in providing safety and permanency is addressing any needs that an individual Child has, and Mother never displayed appropriate insight as to why her Children were in care, and that what their issues were. Mother could not identify which school each Child was attending. Dr. Russell testified he was also concerned with Mother's following the prescriptions as prescribed. He opined that Mother may be over medicating herself. He concluded that based on his evaluation and review of the records, Mother's history of dependence, history of difficulties in maintaining her house, the fact that the Children were removed and out of her care for several years, that she has a diagnosis of post-traumatic stress disorder and bipolar disorder, that Mother is on antipsychotic medication, is certain Mother should be going to treatment at least once a week instead of twice a month. Based on all the evidence he reviewed and obtained himself, Dr. Russell sees no evidence presented that reflects a significant change in Mother's day to day functioning. Therefore, his opinion today would be the same as it was at the time of the evaluation,

Mother does not present with the capacity to provide safety and/or permanency to her Children

This Court found clear and convincing evidence that Mother has refused or failed to perform parental duties, and that Mother lacks the present capacity to perform those parental responsibilities. This Court found that DHS proved by clear and convincing evidence that Mother is incapable of providing safety and permanency for her Children now and in the future. Finally, this Court is not persuaded that Mother can or will remedy the conditions which continue to exist and brought the Children into Court supervision. Mother continues to use prescription drugs, does not have appropriate housing and is only attending individual therapy once per month. Dr. Russell noted that Mother's use of narcotics on a long-term basis is sustenance to addiction. The diagnoses that Mother states that justify those medications clearly indicates a need for treatment. Based on the clear and convincing evidence presented, this Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a) (1), (2), (5), and (8).

**Trial Court Properly Found that Termination of Mother's Parental Rights was in the Child's Best Interest and that DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b).[3]**

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best

[3] Other Considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

interests of the children pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court "shall give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. *In re T.S.M., 71 A3d 251 (Pa. 2013).*

In making this determination, the Court must carefully examine both the tangible and intangible dimension of the needs and welfare of the Children. The tangible dimension of a Child's needs involves providing for the physical necessities of life. The intangible dimension of the parent-child relationship involves the consideration of the love, closeness, comfort and security shared, the emotional bond that may or may not exist between the parent and the Child and the likely effect termination of parental rights will have on the Child. *In re: Involuntary Termination of C.W.S.M. and K.A.L.M., 839 A.2d 410 (Pa.Super. 2003).*

Case Managers provided credible, persuasive testimony regarding the Children's physical and emotional needs and best interests. Mr. Cervantes stated he visits the Children in their foster homes at least once per month, and sometimes multiple times. L.M.O., S.M.O, and A.A.O. are placed together with Foster Parent, N.P., who is the pre-adoptive resource. He opined the Children and Foster mother have a very strong bond, and rely on N.P. for all their needs and safety. Regarding E.J.O., who is placed separately, he visits him once a month at his Foster Home. He opined that the Children are strongly bonded with their Foster parents, and with the other kids in the Foster Home, and characterized the relationship as "beautiful." He testified that Mother was minimally

40

compliant with visitation. Mother missed visits, one in September, one in October, and missed two visits in November. He observed a visit on March 29, 2017, and he noted that Mother was emotionally distraught during the visit because she recently had a death in her family and was upset. She brought dinner and the family ate dinner together. He noted the Children have no difficulty separating from the parents when the visits are over.

The Agency witnesses testified that the Children would not suffer irreparable harm if Mother's parental rights were terminated, and it would be in their best interests to be adopted. All of the Children have close, loving relationships with their Foster Parents, and they are safe. They opined it would be in the best interests of the Children if they were adopted by their Foster Parents.

Therefore, the Court found that clear and convincing evidence was presented that the conditions which led to the Children's placement continue to exist, and the Children would not suffer irreparable harm if Mother's rights were terminated and adoption would be in their best interest.

### Trial Court Properly Found that the Goal Change from Return to Parent to Adoption was in the Children's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental and Moral Welfare of the Children Pursuant to 42 Pa.C.S.A. §6351 (f.1) (2).[4]

The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition

---

[4] 42 Pa.C.S.A. §6351-Disposition of dependent Child.—(f.1). Additional determinations. Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) If and when the Child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the Child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the Child.

41

which is best suited to the safety, protection and physical, mental, and moral welfare of the child; an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g)

Competent and persuasive evidence was presented to this Court by the Agency that reasonable efforts were made by the agency for over three years that the Children have been in placement, to give Mother the avenue for reunification with her Children, however, Mother has failed to use the referrals and resources provide to her. Mother's testimony before the Court was not credible and therefore this Court is not persuaded that she could function in a caregiving role of a parent to provide safety and permanency to her Children.

This Court held a Trial de Novo on November 30, 2017 and granted DHS's Petition to Terminate Parental Rights of Mother. On July 20, 2018, the Superior Court vacated the Orders terminating Mother's parental rights and remanded the cases for an on-the-record determination as to whether counsel adequately consulted with each Child and determined his or her legal interests in the matter. Superior Court further instructed this court, "If the court concludes that counsel did not carry out her legal duties, as espoused in L.B.M., then the court shall order new termination hearings to provide counsel an opportunity to advocate on each Child's behalf. If, however, the court is convinced that counsel fulfilled her duty to each Child, then it may affirm its original termination orders.

This Court finds that the Child Advocate, Regine Charles Asar, Esquire consulted with each Child as instructed by this Court, and determined their legal interests in this

42

matter. She thereby fulfilled her duties, responsibilities and advocacy on behalf of the Children. This Court found the hearing held on February 6, 2019, was adequate and the evidence is further clear and convincing that it would be in the best interest of the Children to be adopted, the termination of Mother's parental rights would present no irreparable harm to the Children and that it would be in their best interest to be adopted.

## CONCLUSION

At the conclusion of the 11/30/2017 hearing, the Court stated:

> I'll deal with Mother first. I had the ability to have a broad view of this case because I was the Judge that presided over the Shelter Care Hearing back in December 15, 2014. And I've been the Judge on this case ever since. And the history of the case begins with the Children coming into care because they were discovered to be suffering from malnutrition. They were suffering from lack of medical care. They were uneducated. They were malnourished. They were not in proper grades. The ones that were in school and the one that should have been in school were not in school.
>
> And they were placed from that time forward. And since that time there's a history of the Department going through a number of case workers. But, all the case workers are consistent in that these two parents were minimally or noncompliant with any of the goals outlined for them. And I will apply this to Father since the evidence is consistent as to both parents. And during the life of the case there was always an issue of where the parents were living.
>
> The Mother took the stand and chose to put her credibility at issue by taking the stand. And quite honestly, throughout all of her testimony I struggle to find one truthful statement by Mother. She has no credibility. Most of the testimony was prepared, choreographed and is a connected series of lies, attempted misrepresentations, deceit, all contrived to convince this Court that she somehow is a ready, willing and able parent to parent these Children. None of her story is believable. I take note that Mother chose to offer just her testimony. Not one

43

document was introduced relative to this matter except for M-1 which was ruled by this Court not to be admissible. And M-2 was a prescription.

So, Mother is asking the Court to rely upon her statements. And I have in comparison a series of objective documents I think we were at DHS-17, which makes the case regarding these parents' unsuitability to parent any of these Children.

We have the testimony of very believable, very competent case workers who all had a very detailed memory of the case. And despite cross-examination that memory and that ability to recite the history of the case was not shaken one bit. Where there is conflict between the Mother's testimony and any of the DHS witnesses' testimony, the DHS witnesses are believable, consistent, factually based. Based upon records which have been kept in detail in this case from the outset in 2014. The one exception to the case workers was the case of Ms. Rios. And she was removed for deception.

But on cross-examination, Dr. Russell opined that nothing that she (Ms. Rios) said would have changed, if it be removed from the record would have changed his opinion about the unsuitability of these two people to parent these Children. And some of the correspondence received from Ms. Rios was a pass through of information from other witnesses and other observers of the record of this case. The witness testified that she went to CEU and gave screens. Yet I see no record of those screens. I see no attempt to get those records from the CEU.

This is a hearing at which time her suitability to parent these Children is at issue. This is a second hearing of the case. The first was unfortunately interrupted by a case decided by the Supreme Court. Also interrupted by some uncertainty injected in the case by the fact that Ms. Rios was let go from the agency for falsification of records. So in an abundance of caution I ordered a De Novo Hearing on this case. And we did. We went over the same evidence that came in at the last hearing. During the testimony I was reviewing the complete record.

She produced no CEU reports. She testified to her mental health treatment yet there are no documents documenting her mental health treatment. And the argument that she

44

gave CEU or she gave the case worker authorization to get the records, it is not the agency's burden to make out your case. You submitted no records documenting your mental health. You gave me a record of your prescribed medicines from 2016. I have no current record. Your own testimony indicating that you ceased using Oxycodone sometime this year creates an issue of credibility and an issue as to whether or not you have successfully addressed any of your drug issues. The last time you were prescribed that was sometime in 2016. And the Dr.'s testimony indicated that Level 1 drug is only good for thirty days and must be renewed in person with a handwritten prescription from a doctor to have it renewed. So your source of Oxycodone had to be illegal.

The lack of familiarity with any of the milestones for a Child. Lack of knowledge as to the school. Lack of knowledge as to the grade. Lack of knowledge as to medical care and medical health condition. All substantiates the case that both Mother and Father have not, cannot, and will not be able to parent these Children going forward in the future. The record is clear, convincing and overwhelming. The lack of attendance at visitation and the explanation for visitation, nothing but lies. I have been dealing with the issue of where Mother and Father have been living for the life of the case. Part of the issue was I attempted to reunite these Children with Father. And it was later discovered that Mother was actually living with Father at the Water Street address. They have always been living there together.

And Mother's explanation of the fact that she didn't know that Father was in prison, I think highlights the absurdity of the testimony by Mother. Two people that have been in contact with each other almost on a daily basis. Part of the issue that I had to deal with, with the visitation and the changing of the visitation was their concerted interaction and attempt to interrupt the visitation process by DHS by constantly finding fault with the case workers. So the idea that she didn't know where he was and doesn't at the time, it's absurd. And I think because of the absurdity of the testimony normally in a case where you are judging credibility it's a balancing test. And I know that the edict and the acts and falsas is one that you can infer that the testimony would be false in everything. But in this case, I have actual proof and I make an actual finding that nothing

45

Mother has said has any ring of truth to it whatsoever. So I am quite comfortable in not believing anything Mother said.

The Children were removed from both Mother and Father's care. Now the evidence regarding 2511 (b), there was an issue raised about would there be any harm to the Children. Of course. These are the birth parents. They have spent time with these parents. But, at a point in time they were unwilling to provide the necessary care, safety and welfare for the Children. And that is when we fortunately began our relationship with these Children back in December of 2014 when they were removed from the parents, found to be severely in need of medical, physical and educational care. And they were placed. And the placement has been successful.

The testimony is clear and convincing that the placement of these Children in these foster homes and recent reunification of two of the Children with the third Child lends more weight to that argument. The issue of whether or not harm would occur, that's not the question. The question is irreparable harm. And I think it was answered throughout the interchanges of testimony. And that is, that with proper love, care, parenting, provision for safety, provision for their welfare, and provision for their future. The harm done in the past to these Children by the parents can be overcome. That's the nature of deciding whether or not there is irreparable harm here. There will be no irreparable harm because the harm done to the Children has already in large part been remediated. And based upon the testimony they are going to continue to flourish.

So considering the record as I have attempted to elucidate in that short period and the record as a whole going back to the beginning of this case, which I presided over, the Court finds that pursuant to 2511 (a) (1), (2), (5), and (8), and 2511 (b), that it is in the best interest of these Children that the rights be terminated. And there would be no irreparable harm if such rights were terminated. I am comfortable in terminating both parent's parental rights and moving the goal to adoption for all four Children. (N.T., 11/30/2017 p.326 at 23-25; p.327 at 1-25; p.328 at 1-25; p.329 at 1-25; p.330 at 1-25; p.331 at 1-25; p.332 at 1-25; p.333 at 1-25; p.334 at 1-25; p.335 at 1-4).

At the conclusion of the 2/06/2019, hearing, the Court stated:

> And I think I made that finding quite clear, but the Superior Court in its wisdom decided that I needed to present more information and of course I believe that the process today was completed.
>
> We of course complied with the remand from the Appellate Court, and I believe that the evidence is further clear and convincing that it would be in the best interest of the children to be adopted, that the termination of Mother's parental rights would present no irreparable harm to the children and that it would be in their best interest to be adopted. I think it's under 2511 (a) (1), (2), (5) and (8) at the prior listing. The hearing was adequate. It explored all of the issues evidentiarily (sic). It provided to the court all the information that I needed and again, I made a determination on the credibility of the witnesses and the weight to be given to the testimony. Again, as I read the remand it was to complete what they perceived to be a necessary issue regarding the statement of the children, although there are some conflicting case law, in fact, one appellate court opinion said you really don't have to-the children don't get to decide whether they get adopted or not, but in the spirit of complying with the appellate court remand I believe today's hearing satisfied that requirement and I'm reiterating the finding.
>
> If necessary, but the termination of Mother's rights are complete as of today with the conclusion of the information, and the goal is changed to adoption. That's why I'm doing, reaffirming the original termination order. Today I am, I'm making a finding and I'm entering an order which affirms the prior termination. So the rights are terminated, let me add the phrase nunc pro tunc, back to the original termination, and they'll deal with that issue, if they wish to, and the goal is changed to adoption. (N.T., 2/06/2019, p.12 at 14-25; p.13 at 1-4, 22-25; p.14 at 1-19; p.15 at 7-22).

For the foregoing reasons, this Court respectfully requests that the Orders dated February 6, 2019, which reinstated the Decrees and Orders

47

of November 30, 2017, terminating Mother, A.O.'s Parental Rights and changing their Permanency Goals to Adoption be AFFIRMED.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

__4-25-19__
DATE

48

## CERTIFCATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION has been served upon the following parties by the manner as designated:

**Family Court Mailbox**

Maureen F. Pié, Esq.
8 Summit St., Ste. 200
Philadelphia, PA 19118
Counsel for Appellant, Mother, A.O.

Robert D. Aversa, Esq., ACS
Bridget M. Warner, Esq., ACS
City of Phila Law Dept.
1515 Arch St., 16th flr.
Counsel for DHS

Adrianna Alfano, Esq.
Patricia A. Korey, Esq.
Defenders Assoc of Phila
1441 Sansom St
Philadelphia, PA 19102
Guardian Ad Litem for Children

Marie Regine Charles-Asar, Esq.
100 S. Broad St., Ste 1518
Philadelphia, PA 19110
Counsel for Children

Robin W. Banister, Esq.
1810 Rittenhouse Sq., #806
Philadelphia, PA 19103
Counsel for Father, M.O.

_____
ALLAN L. TERESHKO, Sr. J.

4-25-19
_____
DATE